[Crim. No. 6011.   Second Dist., Div. One.   Feb. 10, 1958.]

THE PEOPLE, Respondent, v. RUFFIN BRYANT et al., Defendants;   WALTER   WEBSTER   ALEXANDER, Appellant.

H. Clay Jacke for Appellant.

Edmund G. Brown, Attorney General, and Carl Boronkay, Deputy Attorney General, for Respondent.

WHITE, P. J.—The Grand Jury of Los Angeles County returned an indictment wherein the above named defendants were accused of the violation of section 11500 of the Health and Safety Code of the State of California, in that on or about August 22, 1956, they sold a preparation of heroin. Both defendants pleaded not guilty. Trial by jury was duly waived and each defendant was adjudged guilty as charged. Defendant Alexander's motion for a new trial was denied and he was sentenced to state prison. From the judgment of conviction and the order denying his motion for a new trial defendant Alexander prosecutes this appeal.

Concerning the factual background surrounding this prosecution, the record reflects that on August 26, 1956, Cherry L. Brown was a Los Angeles city police officer assigned to the narcotics detail. On that date he was working in an undercover capacity seeking an allegedly known user and peddler

of heroin known as "Chalk." At 1:55 p. m. the officer approached a person seated in an automobile in the 700 block on Fifth Street, believing him to be the man he sought. The person in the automobile proved to be Ruffin Bryant, codefendant herein, and a brother of the man known as "Chalk." Defendant Bryant told Officer Brown that "Chalk" didn't have anything but that he, Bryant, could help him. They walked to the Victor Hotel but Bryant could not find the man supposed to have the narcotics. Then they walked to the New Morris Hotel where they met the appellant.

He was seated in the rear seat of a parked automobile while the officer and Bryant stood beside it. Bryant told appellant that his companion was trying to "score." Appellant went into the New Morris Hotel and came out in about 10 minutes with a small yellow rubber balloon containing a white powder. He got back into the automobile and then handed the balloon through the window to the officer. The latter gave him $11 and left.

Officer Brown took the evidence to the Narcotics Department, put identifying marks on the envelope it was placed in, and had it booked.

Jay A. Allen, a qualified forensic chemist employed by the Los Angeles Police Department examined the contents of the balloon and found it to be heroin.

On November 14, 1956, appellant was interrogated by Police Officer Arthur Logue at the Police Building. Their conversation was substantially as follows:

"(Officer Logue) asked the defendant Alexander how long he had been selling narcotics prior to selling to Brown, and he stated he had only been in town since June and that it had taken him some time to get to know the fellows down there.

"(Defendant Alexander) stated that he felt that it was only for about two weeks and then he had gotten himself a job.

"(Officer Logue) asked him if he kept the narcotics in the car, and he stated no, that the narcotics were stashed in the hotel.

"(Officer Logue) asked him if he had gone to the car simply to remove the narcotics from his pocket, and he stated that was it.

"(Defendant Alexander) stated that although he was not down on the street much any more, he still knew pretty well what was going on down there."

On cross-examination Officer Logue was asked:

"Q. Do you recall specifically his language, what he said?

A. He stated that he had only been in town since June. 'It took me sometime to find out what was going on and know the fellows down there.' He further stated, 'Only about two weeks before I got my job.'

"Q. Well, the thing I am trying to determine, Officer is the exact language, because this is important. Did he say he was selling narcotics, or just what did he say he was doing with them? A. Well, in response to my question, he said——

"Q. Did you ask him 'Have you been selling narcotics?' A. I asked him how long he had been selling narcotics prior to selling to Brown, and he stated he had only been in town since June, and it had taken him some time to get to know the fellows down there, and it had been about a period of about two weeks prior to getting his job.

"Q. Did he say how many sales he made or the quantity? A. No, sir."

Defendant Bryant was called as a witness in his own behalf and acknowledged meeting Officer Brown on August 22, 1957. That the officer inquired of him about his brother "Chalk," saying he wanted to see "Chalk" about "something important." The witness then went into a hotel, returned and informed the officer that "Chalk" was not in the hotel, but that the officer might see him "around the corner."

The witness testified that he then departed, that nothing was said about narcotics until he was about to leave the officer, when the latter stated, "he was trying to score," to which the witness replied that, "I didn't know where he could get any, where he could score at." The codefendant Bryant further testified that on August 22, 1956, he did not see appellant Alexander, and was not present on that day or at any other time "when Alexander (appellant) and (Officer) Cherry were present together." That at no time did the witness "try in any way to get Officer Cherry Brown narcotics."

Appellant testified that he came to Los Angeles about June 3, 1956, and that during the month of August of that year he was employed as "a sort of houseboy and chauffeur, butler" in Beverly Hills; that his hours of work were from 7:30 or 8 a. m. "through the dinner hour until 6:30 or 7 at night." That he worked 5½ days each week. That during the month of August, 1956, he did not know his codefendant Bryant. That he first met Bryant when they made their initial appearance in court. Appellant further testified that he did not know or see Officer Brown on August 22, 1956. That he was then employed and working on his job. That he had no

transaction with the officer and did not deliver any narcotics to him at any time, or receive any money from him.

Called as a witness in behalf of appellant, Marie Ann Ross testified that she was acquainted with him; that the latter worked at the same place where she was employed in August, 1956; that appellant worked every day except Thursdays and Sundays from 7 a. m. to 7 p. m., and commenced to live on the premises about the latter part of August. The witness admitted owning a black Mercury automobile which from time to time she permitted appellant, as well as other people, to drive.

As his first ground for reversal, appellant contends that the trial court committed prejudicial error in unduly restricting his cross-examination of Officer Brown. In this regard appellant complains of the ruling of the trial judge in sustaining objections to his questions seeking to elicit the reason for the officer's termination of service with the Los Angeles Police Department. It is urged that these questions affected the credibility of the witness and that the reason for the officer's resignation, if shown, might reveal "that Mr. Brown (officer) was unreliable or that he was unfit for the detail which he was assigned to or that he had been fired for falsifying public records in obtaining his job as a police officer, or other likely and pertinent reasons indicative of his interests, bias or prejudice . . . Did he have a prior felony record? Was he a user of narcotics himself?"

The record reflects that at the outset of the cross-examination of Officer Brown the following occurred:

"Q. (By Mr. Avery, appellant's trial counsel) Are you presently with the Los Angeles Police Department? A. No, I am not.

"Q. When did you terminate your connection with the L. A. Police Department? A. On December 3d last year.

"Q. What was the reason for your termination?

"Mr. NATHANSON (Deputy District Attorney): Objected to as immaterial.

"THE COURT: Sustained.

"Q. BY MR. AVERY: Did you resign?

"Mr. NATHANSON: I object to that——

"THE WITNESS: Yes.

"Mr. NATHANSON: —as immaterial.

"THE COURT: Objection sustained and the answer stricken."

Appellant's counsel thereupon abandoned that subject. Neither argument or any statement or offer of proof of the

facts intended to be proved was offered. ▮ It is well established that the scope of cross-examination is committed to the sound discretion of the trial judge, and in the absence of a clear abuse of such discretion, rulings in such matters will not be disturbed on appeal (*People* v. *Apodaca,* 132 Cal. App.2d 340, 341 [282 P.2d 182]). ▮ And, as was said in *People* v. *Monson,* 102 Cal.App.2d 308, 313 [227 P.2d 521], ". . . In seeking a reversal of a judgment for exclusion of evidence an appeal is fruitless where the appellant did not fully state the purpose of his offer and facts sufficient to demonstrate its materiality unless the question shows on its face that it was material to the issue." ▮ As pertinently stated by respondent, "Although appellant in his opening brief conjectures as to various indications of bias that might have been disclosed if he had been able to pursue his inquiry as to why Mr. Brown left the police department, it would seem from the above authorities that it is not incumbent upon the trial judge to postulate the propriety of a question immaterial on its face and not indicative of any impeaching effect." The ruling of the trial judge sustaining objections to the foregoing questions propounded by appellant on cross-examination of Officer Brown was therefore proper and did not exceed the bounds of sound discretion.

▮ Appellant's next contention that the evidence is insufficient to support a finding of guilt cannot be sustained. The direct testimony of Officer Brown that he purchased the narcotic from appellant is sufficient to sustain a conviction upon the charge contained in the indictment herein (*People* v. *Grijalva,* 48 Cal.App.2d 690, 691-693 [121 P.2d 23]; *People* v. *Johnson,* 99 Cal.App.2d 559, 563 [222 P.2d 58]; *People* v. *Gebron,* 124 Cal.App.2d 675, 676 [268 P.2d 1068]; *People* v. *Jones,* 153 Cal.App.2d 41, 43 [314 P.2d 93]). The case of the prosecution is further strengthened by the testimony of Officer Logue regarding statements made to him by appellant and from which it can reasonably be inferred that appellant admitted he had been selling narcotics for some two weeks prior to his negotiations with Officer Brown; that he kept the contraband "stashed in the hotel"; and that "he had gone to the car simply to remove the narcotics from his pocket."

Appellant points out that his testimony and that of two other defense witnesses establishes that he was not in the area where the crime allegedly was committed on the date thereof, and that ". . . appellant Alexander's side of the

case could not have under the reason advanced, have received the same or equal appraisal as that of the prosecution.''

■ This argument merely presents a conflict in the evidence which is committed to the duly constituted trier of the facts who is the sole and exclusive judge of the credibility of witnesses. When the trial court has made its decision on the conflict presented by contradictory testimony of the witnesses, that decision is binding upon the appellate tribunal, as is any question of fact passed upon by it (*People* v. *Shaver,* 7 Cal.2d 586, 593, 594 [61 P.2d 1170]), unless the testimony relied upon by the trial court can be deemed inherently improbable. No such contention can be sustained in the instant case. ■ As was said in *People* v. *Jones, supra,* 43, which presents a factual situation comparable to the case at bar, ''The argument here goes solely to the weight to be given the testimony of Officer Means, a matter with which we have no concern. The only question before the trial court was one of fact. No question of law was presented. . . . The court chose to believe the officer. The fact that the officer's testimony was not corroborated is of no consequence on appeal. The evidence supports the judgments.'' (See also *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

Equally without merit is appellant's final contention, ''That the court erred in its finding of guilt as to the appellant, since such findings could not be based on a doctrine of guilt beyond a reasonable doubt, but rather on suspicion, conjecture and a preponderance of evidence.''

Appellant's assertion that the proof offered by the prosecution fails to establish guilt beyond a reasonable doubt because it rests upon ''suspicion, conjecture and a preponderance of the evidence'' is answered by what we have stated above in the consideration of appellant's challenge to the sufficiency of the evidence. He relies strongly upon the case of *People* v. *Draper,* 69 Cal.App.2d 781, 786 [160 P.2d 80], but because of the variance between the factual situation therein and the one with which we are here concerned, the cited case is not helpful. In the Draper case the only evidence involving the accused in the burglary of three Indio service stations was that the companion with whom he had driven to Indio was seen by a police officer leaving one of the stations and who upon being asked for identification fled; that the appellant Draper a short time later was seen by the officer standing beside a building 50 to 75 feet from the service station; that when the officer walked toward appellant he started to run away and had to be pursued; and that his testimony regarding

his trip to Indio was contrary to the story he told the officer at the police station. In reversing the judgment, the court said, at page 786:

"The foregoing evidence points the finger of suspicion at Draper, shows that he had an opportunity to participate in the commission of the crimes and proves that he was not a truthful witness. This is not sufficient to sustain the burden resting on the People of proving him guilty beyond a reasonable doubt . . ."

In contrast to the highly circumstantial evidence prevailing in the Draper case, *supra,* we have before us, in the case now engaging our attention, the positive direct evidence of Officer Brown that he actually made a purchase of narcotics from appellant. ██ Pertinent to appellant's final contention, consisting in the main, of an attack upon the credibility of Officer Brown, is the following statement of our Supreme Court in the case of *People* v. *Braun,* 14 Cal.2d 1, 5 [92 P.2d 402]:

"It is a familiar rule that in reviewing the correctness of factual determinations, the function of an appellate court is limited to the question whether there is any substantial evidence in the record to support the judgment. To entitle a reviewing court to set aside a jury's finding of guilt, the evidence of identity must be so weak as to constitute practically no evidence at all. (Citing cases.) ██ *In a case such as the present one, where there is positive direct testimony that the defendant was one of the perpetrators of the crime, it is incumbent upon him to show that the testimony is inherently unbelievable in order to prevail.* 'A statement, to bear upon its face the brand of improbability, or which may be said to be unbelievable, per se, must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances described, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do.' (*People* v. *Haydon,* 18 Cal. App. 543, 553 [123 P. 1102].)" (Emphasis added.)

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Doran, J., and Fourt, J., concurred.